**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**IRIS R.,**

<b>Plaintiff,</b>

    **vs.**                                       **1:19-CV-1165**
                                                        **(MAD)**

**ANDREW M. SAUL,** *Commissioner of the*
*Social Security Administration*,

<b>Defendant.</b>

_____

| | |
|---|---|
| **APPEARANCES:** | **OF COUNSEL:** |
| **LAW OFFICE OF LEWIS B. INSLER** | **LEWIS B. INSLER, ESQ.** |
| 17 Newcomb Place | |
| White Plains, New York 10606 | |
| Attorneys for Plaintiff | |
| **SOCIAL SECURITY ADMINISTRATION** | **KEVIN MICHAEL PARRINGTON, ESQ.** |
| J.F.K. Federal Building, Room 625 | |
| 15 New Sudbury Street | |
| Boston, Massachusetts 02203 | |
| Attorneys for Defendant | |

**Mae A. D'Agostino, U.S. District Judge:**

<b>MEMORANDUM-DECISION AND ORDER</b>

<b>I. INTRODUCTION</b>

Plaintiff commenced this action under Title II of the Social Security Act seeking Disability Insurance Benefits ("DIB"), alleging disability beginning in January 2012. *See* Administrative Transcript ("Tr.") at 149-52. Plaintiff's application for DIB was administratively denied, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). *See id.* at 70-75, 84-85. An ALJ held a hearing and denied Plaintiff's application in June 2018. *See id.* at 16-59. Plaintiff seeks judicial review of the Commissioner's decision under 42 U.S.C. § 405(g).

Currently before the Court are the parties' cross-motions for judgment on the pleadings. *See* Dkt. Nos. 8 & 9.

## II. BACKGROUND

### A.     Plaintiff's Age, Education, and Work Experience

Plaintiff was born in 1961, making her fifty-years old at the alleged onset date of January 1, 2012, and fifty-four years old at her date last insured of September 30, 2015. *See* Tr. at 149, 153, 171. Plaintiff has some college education and worked as a police officer. *See id.* at 52, 175. Plaintiff completed one year of college and was 5' 1" tall and weighed 155 pounds at the time of her application. *See id.* at 174-75. In the relevant fifteen years prior to the hearing, Plaintiff worked primarily for the New York City Police Department, plus short stints as a teacher's assistant and an airline customer service agent after leaving the NYPD. *See id.* at 175, 194.

### B.     Medical Evidence Before Plaintiff's Insured Status Expired in September 2015

Plaintiff alleges that she became disabled in January 2012 due to COPD developed as a result of serving as a "[World Trade Center] responder," asthma, gastroesophageal reflux disease, sinusitis, and obstructive sleep apnea. *See id.* at 174. Prior to the expiration of her insured status in September 2015, Plaintiff indicated that her health did not limit her in moderate activities, such as moving a table, pushing a vacuum cleaner, bowling, or playing golf, in March 2012, June 2013, and June 2014. *See id.* at 320, 331, 341. Plaintiff also claimed that her physical health had not limited her work or daily activities. *See id.* In June 2015, Plaintiff stated that her health limited her only "a little" in moderate activities. *See id.* at 309. Similarly, on each of these occasions, Plaintiff stated that her health either caused no limitations or limited her only "a little" in climbing several flights of stairs, and she either denied feeling tired or having little energy, or denied having

any difficulties in doing work, taking care of things at home, or getting along with others.  *See id.* at 309, 316, 320, 327, 331, 337, 341, 348.

In June 2013, John Goutos, M.D., noted that Plaintiff had no chest pain or shortness of breach and was asymptomatic.  *See id.* at 411.  Plaintiff reported feeling good and that she had stopped smoking after thirty years.  *See id.* at 412.  A chest x-ray showed clear lungs and no significant abnormalities.  *See id.* at 407-08.  A spirometry showed restriction and slightly improved results.  *See id.* at 409-11

Pulmonary function testing in April 2014 showed "[m]oderate restriction."  Tr. at 495.  In June 2014, Dr. Goutos observed cough, wheezing, and shortness of breath.  *See id.* at 396.  A spirometry showed restriction, and Plaintiff's results had worsened.  *See id.* at 397.  In July 2014, Plaintiff reported recently starting cardiovascular exercise, which involved "significant exertion" and caused labored breathing (dyspnea).  *See id.* at 239.  Plaintiff denied nocturnal symptoms or going to the emergency department.  *See id.*  Gina Lisker, M.D., observed that Plaintiff had "[s]light[ly] prolonged" breathing out (expiratory phase) but normal respiratory rhythm and effort, clear lungs, no respiratory distress, and no accessory muscle use.  *See id.* at 240.  A pulmonary function test showed "moderate obstructive lung disease," "normal lung volumes," and "normal diffusion capacity."  *Id.* at 241.[1]

In October 2014, Plaintiff reported a respiratory infection and feeling "very well" beforehand.  *See* Tr. at 236.  Dr. Lisker stated that she had a few expiratory wheezes, normal respiratory rhythm and effort, good air entry, no respiratory distress, and no accessory muscle use.  *See id.* at 237.  In November 2014, Plaintiff reported feeling better after her respiratory infection.

---

[1] Diffusion capacity measures how well lungs move oxygen from the air into the bloodstream.  *See* Nat'l Inst. of Health, MedlinePlus (last visited May 6, 2020), available at https://medlineplus.gov/ency/article/003853.htm.

*See id.* at 233.  Dr. Lisker observed that Plaintiff had normal respiratory rhythm and effort, clear lungs, no respiratory distress, and no accessory muscle use.  *See id.* at 234.  Plaintiff's gait was normal and sufficient for exercise testing and her COPD was stable.  *See id.* at 234-35.

Plaintiff reported exercising in February 2015.  *See id.* at 230.  Plaintiff indicated that she had nasal congestion and had not seen an ear, nose, and throat specialist for several years.  *See id.* at 230.  Plaintiff reported dozing off during inactivity,[2] but not while remaining active.  *See id.* Dr. Lisker observed that Plaintiff had a few scattered wheezes during expiration but normal respiratory rhythm and effort, no respiratory distress, and no accessory muscle use.  *See id.* at 231. Plaintiff's gait was normal and sufficient for exercise testing.  *See id.*

In June 2015, Dr. Wilson observed that Plaintiff's lungs were clear.  *See* Tr. at 385.  Her physical examination was normal and her spirometry was similar to one in 2013.  *See id.* at 386-87.  Later that month, Plaintiff reported "mild" sleep apnea.  *See id.* at 456.  Terry E. Baldwin, D.O. stated that Plaintiff had mild wheezing but that her COPD and asthma were stable.  *See id.* at 459.  A pulmonary function test showed that a measurement of how much air Plaintiff could force from her lungs in one second ($FEV_1$) was 66% of the predicted value.  *See id.* at 468.

In July 2015, Plaintiff reported some sinus congestion but no chest pain, palpitations, or swelling (edema).  *See id.* at 438.  Andrew Needelman, M.D., F.C.C.P., observed that Plaintiff had "mild inspiratory wheezes" but no use of accessory muscles.  *See id.* at 440.  Dr. Needelman reviewed the spirometry and concluded that it suggested a "possible mild restrictive ventilator defect."  *Id.*

C.     **Written Statements**

---

[2] The medical record states that Plaintiff "[w]ill doze off during an activity during the day but not while active."  Tr. at 230.  "[A]n activity" appears to be a transcription error.

In the Adult Function Report, Plaintiff stated that her husband handles most of the household chores, though she can let the dog out into the backyard and can occasionally cook dinner.  Plaintiff claimed that her sleep is disturbed due to sleep apnea, that she has difficulty dressing, and that she needs to use her inhaler prior to showering due to the steam.  *See* Tr. at 184. When she cannot cook, her husband or her adult daughters prepare meals, though she can go shopping with her husband.  *See id.* at 185-86.  Plaintiff claimed that she needs help with housekeeping in order to avoid dust, can no longer do any yard work, take walks, dance, bicycle, exercise, or play with her grandchildren.  *See id.* at 186, 188.  Plaintiff also alleged that she has difficulty standing, walking, climbing stairs and arising from a kneeling or squatting position.  *See id.* at 188.  She claimed that she walks a quarter of a mile at a slow pace before having to rest from three-to-five minutes to let her heart rate slow.  *See id.* at 189.

In the Disability Report-Appeal filed at the time the hearing was requested, Plaintiff wrote that she has severe hacking, constant coughing, shortness of breath, and that her daughters must handle all of the household chores.  *See id.* at 203.  Plaintiff claimed that her medications make her dizzy and light headed and that she also feels chest pressure.  *See id.* at 203, 207, 226.  In the portion of the Function Report relating to asthma, Plaintiff described the attacks, said that they occur daily and that they have been worsening.  To treat her asthma attacks, Plaintiff uses medication, inhalers, and a nebulizer.  *See id.* at 191.

**D.    Hearing Testimony**

During the hearing before the ALJ, Plaintiff testified that her respiratory problems began after she worked at Ground Zero in the months after September 11, 2001.  *See* Tr. at 38-40. Plaintiff eventually retired in 2007 because she could no longer run, complete the necessary paperwork, use force, or even deal verbally with unruly persons or the public.  *See id.*

5

Plaintiff claimed that her symptoms prior to her date last insured were difficulty breathing, tiring easily, inability to walk, run, climb stairs and lifting. Similar to her written statement, Plaintiff testified to walking no more than two blocks, then having to rest up to five minutes before continuing and that, as a result, she could not keep up with her grandchildren, climbing stairs became difficult, and that she moved from an apartment to a ranch style house. *See id.* at 41-43. Additionally, Plaintiff testified that her husband was required to begin handling the household chores and that she could no longer care for her father. *See id.* at 43.

Plaintiff further testified that her sleep apnea causes daytime fatigue, that she can become short of breath just getting dressed, and that she is limited to three-to-four hours of sleep per night. *See id.* at 44, 47. Plaintiff claimed that, while the medications help "somewhat," she needs a nebulizer treatment up to four times a day. *See id.* at 44, 48. Finally, Plaintiff claimed that she was awaiting a CPAP machine to use for her sleep apnea. *See id.* at 45-46.

At the hearing, Josiah Pearson testified as a vocational expert without objections. *See id.* at 51. Mr. Pearson stated that Plaintiff's past relevant work as a police officer was classified as medium exertion with a specific vocational preparation ("SVP")[3] of 6, making it skilled. *See id.* He testified that from this job she had acquired transferable skills such as investigating, "protecting," responding to emergencies, critical thinking, and higher level communication skills. *See id.* at 52.

During the hearing, the ALJ asked Mr. Pearson the following hypothetical question:

> So, assuming an individual with the same age, education and past
> work experience as the Claimant. Is limited to a light exertional

---

[3] Specific vocational preparation, or SVP, is the amount of time typically required to perform a job at an average level. Skilled work typically has an SVP above 5. *See* POMS DI 25001.001 Medical and Vocational Quick Reference Guide #75, 77 (last visited May 6, 2020), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001.

> level.  Can never climb ladders, ropes or scaffolds.  Occasionally
> climb ramps, stairs, balance, stoop, kneel, crouch and crawl.  Is to
> avoid extreme concentrated exposures to extreme cold or extreme
> heat.  Further limited to concentrated exposures to fumes, odors,
> dust, gases.  Based upon those limitations could such an individual
> perform any jobs considering any transferable skills as well?

*Id.* at 52-53.  In response, Mr. Pearson responded that the hypothetical claimant would be able to

perform the job of a merchant patroller, which is considered "a semi-skilled job, SVP 3," which is

rated at the light level of exertion.  *See id.* at 53.  Additionally, Mr. Pearson stated two other

occupations would be that of a security guard or bailiff, which both have an SVP 3 and are rated

at the light level of exertion.  *See id.*  As to the security guard position, Mr. Pearson indicated that,

even eliminating jobs that would potentially expose the hypothetical claimant "to weather and/or

cold and heat extremes," there are still significant positions available in the national economy.

*See id.*  Finally, Mr. Pearson was asked by the ALJ, assuming the same limitations as before, if

that individual needed "to take extended breaks outside of the normal eight-hour breaks which

would result in an individual being off task for more than 15 percent of a work day could such an

individual perform any past work or any jobs?"  *Id.* at 54.  In response, Mr. Pearson responded

that he did not believe that employers would tolerate that amount of time off task "so there would

not be work available for an individual."  *Id.*

### III. DISCUSSION

A.    ***Lucia v. Securities & Exchange Commission*, 138 S. Ct. 2044 (2018)**

In her motion for judgment on the pleadings, Plaintiff first contends that this case should

be remanded because the ALJ was not properly appointed when the hearing was held.  *See* Dkt.

No. 8 at 7-14.  Specifically, relying on *Lucia v. Securities & Exchange Comm'n*, 138 S. Ct. 2044

(2018), Plaintiff argues that the Court must remand this case to the SSA for a new hearing on the

grounds that the ALJ presiding over her claim is an inferior officer under the Appointments Clause and was not constitutionally appointed consistent with that provision. *See id.* The Commissioner, however, argues that Plaintiff failed to raise this argument before the SSA and since a constitutional challenge under the Appointments Clause is nonjurisdictional, Plaintiff forfeited the argument by failing to raise it. *See* Dkt. No. 9 at 5-14.

Under the Appointments Clause, Congress may vest appointment of "inferior Officers ... in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II, § 2, cl. 2. In *Lucia v. Securities & Exch. Comm'n*, the Supreme Court held that ALJs for the Securities and Exchange Commission ("SEC") are "'[o]fficers of the United States,' subject to the Appointments Clause," and that the ALJ at issue had been improperly appointed by staff members, instead of the head of the department. *See Lucia*, ___ U.S. ___, 138 S. Ct. 2044, 2051 (2018). Upon a judicial determination that an ALJ who presided over an administrative hearing had not been appointed in compliance with the Appointments Clause, the appropriate remedy was a new hearing by a different, constitutionally-appointed ALJ. *See id.* at 2055. District Courts have since applied *Lucia* to Social Security Administration ("SSA") ALJs. *See, e.g.*, *Williams v. Berryhill*, No. 17-CV-1660, 2019 WL 1271647, *6 (E.D.N.Y. Mar. 19, 2019); *Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 349-50 (S.D.N.Y. 2019).[4]

---

[4] The SSA's ALJs are now "properly appointed." On July 10, 2018, the President of the United States issued an Executive Order stating that "perhaps all — ALJs are 'Officers of the United States' and thus subject to the Constitution's Appointments Clause, which governs who may appoint such officials." Exec. Order No. 13843, 83 Fed. Reg. 32755 (July 10, 2018). On July 16, 2018, the Acting Commissioner of Social Security ratified the appointments of all SSA ALJs and approved those appointments as her own, thereby remedying the issue identified in *Lucia*. *See* Social Security Emergency Message (EM) 18003 REV 2, § B (*available at* https://secure.ssa.gov/apps10/reference.nsf/links/08062018021025PM); Social Security Ruling 19-1p, 2019 WL 1324866 (S.S.A. Mar. 15, 2019). Here, the hearing and the ALJ's decision occurred prior to July 16, 2018.

8

In *Lucia*, the Supreme Court specifically stated that one is only entitled to relief if the challenge to the constitutional validity of the appointment of the adjudicating officer is timely, but the plaintiff in *Lucia* had raised that issue before the SEC. *See Lucia*, 138 S. Ct. at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 182-83, 115 S. Ct. 2031, 132 L. Ed. 2d 136 (1995)).  The Second Circuit has not yet addressed whether the failure to raise an Appointments Clause challenge to the ALJ during the SSA administrative process precludes pursuing that argument in subsequent judicial proceedings, although it recently ruled on that issue with respect to SEC ALJs. *See Gonnella v. United States Sec. & Exch. Comm'n*, 954 F.3d 536, 543-46 (2d Cir. 2020) (holding that "a litigant who does not object to the constitutionality of an ALJ at any point during ... SEC proceedings forfeits that challenge").  The vast majority of the district courts that have considered the issue of waiver have concluded that a plaintiff waives her Appointments Clause challenge under *Lucia* when she does not raise it during the Commissioner's agency proceedings. *See Nunez v. Saul*, No. 3:18-cv-1952, 2020 WL 967475, *13 (D. Conn. Feb. 28, 2020) (citing cases).

Here, Plaintiff does not dispute that she failed to raise her Appointments Clause argument at the administrative level.  *See* Dkt. No. 8 at 8.  Rather, Plaintiff argues that the Commissioner's waiver argument is meritless, relying on guidance provided by the SSA.  In March 2019, the Commissioner issued SSR 19-1, which provided guidance when a *Lucia* Appointments Clause challenge is raised before the Appeals Council.  In that ruling, the Commissioner indicated that remand to a new ALJ is the appropriate remedy when the claimant raises an Appointments Clause challenge when the issue is raised to the Appeals Council.  *See id.* at 10.  According to Plaintiff, SSR 19-1 "unambiguously provides that a claimant need not raise a *Lucia* Appointments Clause challenge at the ALJ level in order to obtain relief on that issue from the [Appeals Council].  In

other words, there is no issue exhaustion/forfeiture rule with respect to *Lucia* challenges at the ALJ level under SSA's own officially stated policy." *Id.* Plaintiff argues that SSR 19-1 "is evidence that the Commissioner does not require the objection to be raised before the ALJ for him to issue a remand." *Id.*

As the Commissioner correctly notes, in *Lucia* the Supreme Court held that a party "who makes a *timely* challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief." *Lucia*, 138 S. Ct. at 2055 (emphasis added). Since a constitutional challenge under the Appointments Clause is "nonjurisdictional," a party may forfeit that challenge if it is not timely raised. *See D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 351 n.5 (5th Cir. 2013).

The Third Circuit recently held that Social Security claimants do not need to present an Appointments Clause claim during SSA administrative proceedings, and instead may raise that claim for the first time in district court. *See Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 155-56 (3d Cir. 2020). In excusing the plaintiff's failure to challenge the ALJ's appointment during the administrative process, the Third Circuit determined that there was no statutory or regulatory issue exhaustion requirement that governs SSA proceedings. *See id.* at 153. Assessing three factors – the nature of the claim, the characteristics of the SSA review, and the interests involved – the Third Circuit held that timely exhaustion of an Appointments Clause challenge was not required in the SSA context. *See id.* at 153.

*Cirko* and other cases endorsing an exception to any issue exhaustion requirement in SSA proceedings first look to two cases that preceded *Lucia*. In *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 879-80 (1991), the Supreme Court held that Appointments Clause challenges were deemed to be "in the category of nonjurisdictional structural constitutional

objections that could be considered on appeal whether or not they were ruled upon below." *Id.* In *Freytag*, the Court exercised its discretion to review an Appointments Clause challenge that had not been raised before the Tax Court because the issues raised "important questions" "about the Constitution's structural separation of powers." *Freytag*, 501 U.S. at 872. In that case, the Court was tasked with deciding whether the authority that Congress has granted the Chief Judge of the United States Tax Court to appoint special trial judges transgressed the structure of separation of powers. *See id.* at 871. The Supreme Court explained that it faced a constitutional challenge that was "neither frivolous nor disingenuous" and which went directly "to the validity of the Tax Court proceedings," and effectively the scope of cases that special trial judges could preside over, such that it was a "rare case[ ]" for which the Court should exercise discretion to hear issues not previously raised below. *See id.* at 873-74, 877-79.

*Cirko* also considered *Ryder v. United States*, 515 U.S. 177 (1995), decided five years after *Freytag*. In *Ryder*, the Supreme Court found that the challenge to the constitutional appointment of civilian judges to the Court of Military Review must be "timely." *Ryder*, 515 U.S. at 182-83. The *Lucia* court also applied a timeliness requirement in the context of Securities and Exchange Commission proceedings. *See Lucia*, 138 S. Ct. at 2055.

Recognizing that these precedents all involved different agencies and different procedural backgrounds, the Third Circuit found that exhaustion was generally inappropriate "where a claim serves to vindicate constitutional claims like Appointments Clause challenges, which implicate both individual constitutional rights and the structural imperative of separation of powers." *Cirko*, 948 F.3d at 154. It noted the Supreme Court's holding in *Sims v. Apfel*, 530 U.S. 103, 107 (2000), that exhaustion of issues before the SSA Appeals Council was not required to obtain judicial relief, and observed that the "rationales driving *Sims* generally apply to ALJs no less than

[Administrative Appeals Judges]...." *Id.* at 156. Echoing the plurality opinion in *Sims*, the *Cirko* decision emphasized that ALJ hearings are "inquisitorial and driven by the agency rather that the claimant," and that the governing regulations did not have an express exhaustion requirement. *Id.* at 155-56. Finally, the Third Circuit found that the individual interests of an SSA claimant outweigh the governmental interest in issue exhaustion. *See id.* at 156-57. Unlike an adversarial proceeding, the Commissioner has the primary responsibility for identifying and developing the issues, and the claimant is generally not required to develop facts or make arguments. *See id.* An exhaustion requirement would therefore impose an "unprecedented burden" on SSA claimants. *Id.* at 156. In contrast, the *Cirko* decision described the SSA Commissioner's interest in requiring exhaustion as low, because constitutional questions are outside the agency's expertise and the agency was incapable of providing effective relief to an applicant who raised concerns about the Appointments Clause. *See id.* at 158.

The Court has carefully reviewed the Third Circuit's ruling, as well as those cases within the Second Circuit that have found its reasoning to be "persuasive." *E.g.*, *Jenny R. v. Comm'r of Soc. Sec.*, No. 5:18-cv-1451, 2020 WL 1282482, *5 (N.D.N.Y. Mar. 11, 2020: *Suarez v. Saul*, No. 3:19-cv-173, 2020 WL 913809, *3 (D. Conn. Feb. 26, 2020). Ultimately, this Court finds that Plaintiff was still required to raise the Appointments Clause issue at the agency level prior to raising it in federal court, particularly in light of the long-standing requirement, which the Supreme Court reaffirmed in *Lucia*, that challenged to the constitutional appointment of a judge must be timely. This ruling is consistent with the "vast majority" of district courts that have considered the Appointments Clause as it relates to SSA ALJs. *See Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 351 (S.D.N.Y. 2019) (summarizing cases in the Second Circuit following *Lucia* prior to *Cirko*); *Herring v. Saul*, No. 18-cv-120, 2020 WL 1528163, *10 (N.D. Iowa Mar.

31, 2020) (listing cases outside the Third Circuit that have declined to follow *Cirko*); *Latosha N. v. Saul*, No. 18-cv-2475, 2020 WL 1853310, \*7-8 (C.D. Cal. Apr. 13, 2020) (listing cases in the Ninth Circuit that have declined to follow *Cirko*); *Gagliardi v. Soc. Sec. Admin.*, ___ F. Supp. 3d ___, 2020 WL 966595, \*5-6 (S.D. Fla. 2020) (declining to follow *Cirko*); *Berns v. Saul*, No. 18-cv-2068, 2020 WL 1330432, \*7 (N.D. Iowa Mar. 23, 2020) (collecting cases requiring the issue to be raised at the administrative level); *Lincoln G. v. Saul*, No. 18-CV-585, 2020 WL 1318794, \*6 (N.D. Okla. Mar. 2020) ("The courts reviewing Social Security decisions where the Appointments Clause issue has been raised mostly find that the issue was forfeited because it was not raised before the Social Security Administration"); *Honeycutt v. Saul*, No. 3:18-cv-1430475, \*4 (W.D. Ky. Mar. 23, 2020) (declining to follow *Cirko*).[5]

Indeed, requiring administrative exhaustion of an Appointments Clause claim, either before the ALJ or Appeals Council, is consistent with Supreme Court precedent.  As a court recently noted, "[r]egularly permitting unsuccessful claimants to raise Appointments Clause challenges for the first time on judicial review, especially when the arguments underlying those challenges were available at the administrative level, would 'encourage the practice of "sandbagging": suggesting or permitting, for strategic reasons, that the adjudicative entity pursue a certain course, and later — if the outcome is unfavorable — claiming that the course followed

---

[5] In her motion, Plaintiff relies upon, among other cases, *Tutolo v. Berryhill*, No. 18-cv-10538, Dkt. No. 31 (S.D.N.Y.).  In that case, Magistrate Judge Kevin Fox issued a report and recommendation in which it was recommended that the district court remand the case to the commissioner based on the plaintiff's Appointments Clause argument that was first raised before the district court.  The Commissioner objected to that recommendation and, on March 31, 2020, the district court rejected the portion of the recommendation finding that the plaintiff did not forfeit her Appointments Clause argument by failing to raise it before the SSA.  *See Tutolo v. Berryhill*, No. 18 Civ. 10538, 2020 WL 1593568, \*5-\*6 (S.D.N.Y. Mar. 31, 2020).

was reversible error.'" *Bonilla-Bukhari*, 357 F. Supp. 3d at 352 (quoting *Freytag v. C.I.R.*, 501 U.S. 868, 895 (1991) (Scalia, J., concurring in part and concurring in judgment)).

Unlike *Freytag*, the present case is not such a "rare" or "exceptional" circumstance that warrants discretionary review of issues not raised during the administrative proceeding. "Appointments Clause claims, and other structural constitutional claims, have no special entitlement to review. A party forfeits the right to advance on appeal a nonjurisdictional claim, structural or otherwise, that he fails to raise at trial." *Id.* at 893-84 (Scalia, J., concurring in part and concurring in judgment). "No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Id.* at 894 (citation omitted). "Forfeiture is 'not a mere technicality and is essential to the orderly administration of justice.' ... [A] trial on the merits, whether in a civil or criminal case, is the 'main event,' and not simply a 'tryout on the road' to appellate review. The very word 'review' presupposes that a litigant's arguments have been raised and considered in the tribunal of first instance." *Id.* at 895 (internal citations and footnote omitted).

Regularly excusing forfeiture of Appointments Clause challenges under *Freytag* risks eroding the rule in *Ryder* that an Appointments Clause challenge must be "timely" to afford the challenger relief. Moreover, applying *Freytag*'s rare case exception here would disincentivize claimants from raising Appointments Clause challenges at the administrative level. Indeed, regularly permitting unsuccessful claimants to raise such challenges for the first time on judicial review would "encourage the practice of 'sandbagging,'" permitting a claimant a second bite at the apple when she receives an unfavorable ruling before the SSA on the merits of her petition.

14

Accordingly, the Court denies Plaintiff's motion for judgment on the pleadings insofar as she seeks remand on the Appointments Clause issue.

**B.      Standard of Review**

### 1. Substantial Evidence

A court's review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence and the correct legal standards were applied. *See Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S. Ct. 456, 95 L. Ed. 456 (1951)). If the Commissioner's disability determination is supported by substantial evidence, that determination is conclusive. *See id.* Indeed, where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's decision must be upheld — even if the court's independent review of the evidence may differ from the Commissioner's. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982); *see also Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citations omitted). However, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed even though the ultimate

conclusion reached is arguably supported by substantial evidence.  *Martone v. Apfel*, 70 F. Supp.

2d 145, 148 (N.D.N.Y. 1999) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### 2. Disability Determination — The Five-Step Evaluation Process

The Social Security Act defines "disability" as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a

claimant's:

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience, engage
> in any other kind of substantial gainful work which exists in the
> national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The ALJ must follow a five-step evaluation process in deciding whether an individual is

disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  At step one, the ALJ must determine whether the

claimant has engaged in substantial gainful activity.  A claimant engaged in substantial gainful

activity is not disabled, and is therefore not entitled to benefits.  *See id.* §§ 404.1520(b),

416.920(b).

If the claimant has not engaged in substantial gainful activity, then step two requires the

ALJ to determine whether the claimant has a severe impairment or combination of impairments

which significantly restricts his physical or mental ability to perform basic work activities.  *See id.*

§§ 404.1520(c), 416.920(c).

16

If the claimant is found to suffer from a severe impairment or combination of impairments, then step three requires the ALJ to determine whether, based solely on medical evidence, the impairment or combination of impairments meets or equals an impairment listed in Appendix 1 of the regulations (the "Listings"). *See id.* §§ 404.1520(d), 416.920(d); *see also id.* Pt. 404, Subpt. P, App. 1. If the claimant's impairment or combination of impairments meets one or more of the Listings, then the claimant is "presumptively disabled." *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)).

If the claimant is not presumptively disabled, step four requires the ALJ to assess whether — despite the claimant's severe impairment — he has the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). The burden of proof with regard to these first four steps is on the claimant. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).

If it is determined that the claimant cannot perform his past relevant work, the burden shifts to the Commissioner for step five. *See Perez*, 77 F.3d at 46 (citing *Carroll*, 705 F.2d at 642). This step requires the ALJ to examine whether the claimant can do any type of work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). The regulations provide that factors such as a claimant's age, physical ability, education, and previous work experience should be evaluated to determine whether a claimant retains the RFC to perform work in any of five categories of jobs: very heavy, heavy, medium, light, and sedentary. *See Perez*, 77 F.3d at 46 (citing 20 C.F.R. § 404, Subpt. P, App. 2). "[T]he Commissioner need only show that there is work in the national economy that the claimant can do; [she] need not provide additional evidence of the claimant's residual functional capacity." *Poupore*, 566 F.3d at 306 (citing 20 C.F.R. § 404.1560(c)(2)).

**D.      The ALJ's Decision**

At step one of the sequential evaluation, the ALJ found that Plaintiff last met the insured status requirements of the SSA on September 30, 2015, and that she did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2012, through her date last insured of September 30, 2015.  *See* Tr. at 21.  At step two, the ALJ found that, through the date last insured, Plaintiff had the severe impairment of COPD with asthma.  *See id.* Additionally, the ALJ noted that Plaintiff suffered from the non-severe impairment of sleep apnea, finding that it was not severe because, although it had been diagnosed, "it has not been shown to cause a more than slight limitation on [Plaintiff's] ability to perform basic work activities."  *Id.*

At step three, the ALJ found that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R., Subpart P, Appendix 1.  *See id.* at 22.  Specifically, the ALJ found that under listing 3.03, Plaintiff must have chronic asthmatic bronchitis or attacks that require physician intervention occurring at least once every two months in spite of prescribed treatment, which the record did not support.  *See id.*  Further, under listing 4.00, the ALJ found that the record did not support finding that Plaintiff suffered from heart disease that results from chronic heart failure due to ventricular dysfunction; discomfort or pain due to myocardial ischemia; inadequate cerebral perfusion; or central cyanosis.  *See id.*

At the fourth step, the ALJ found that, after careful consideration of the entire record, Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b).  *See id.* at 22.  The ALJ further provided for the following specific limitations: never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and avoid exposure to extreme cold and heat, fumes, odors, dust, and gases.

*See id.*  Based on these limitations, the ALJ found that Plaintiff was unable to perform her past relevant work.  *See id.* at 24.

At the fifth and final step, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that existed in significant numbers in the national economy that Plaintiff could have performed.  *See id.* at 25.  Specifically, the ALJ found that Plaintiff was capable of performing the jobs of "merchant patrol," security guard, and bailiff.  *See id.*  As such, a finding was "not disabled" was made.  *See id.*

### 3. Application

In her motion, Plaintiff contends that the ALJ's RFC and decision "cannot stand, as they are derived from an analysis containing multiple errors of law."  Dkt. No. 8 at 14.  First, Plaintiff claims that the ALJ erred in failing to abide by her "independent duty to make reasonable efforts to obtain a report prepared by [Plaintiff's] treating physician that includes an RFC assessment." *Id.* at 16 (citing *Smith v. Astrue*, 896 F. Supp. 2d 163, 176 (N.D.N.Y. 2012); *Smith v. Comm'r of Soc. Sec.*, No. 5:17-cv-488, 2018 WL 1684337, *6 (N.D.N.Y. Apr. 5, 2018)).  Plaintiff argues that, "without the input of an opinion from any medical professional, the ALJ substituted her own opinion for that of a medical source in formulating the RFC."  *Id.*

As discussed above, a claimant's RFC is the most that he or she can do despite his or her impairments.  *See* 20 C.F.R. § 404.1545(a).  An ALJ determines a claimant's RFC based on all relevant evidence, including medical history, medical signs, laboratory findings, the effects of treatment, daily activities, lay evidence, and medical source statements.  *See* 20 C.F.R. § 404.1545(a)(3).  Here, the ALJ determined that Plaintiff had an RFC for light work with additional limitations.  *See* Tr. at 22.

#### a. Need for a Medical Opinion

Contrary to Plaintiff's contention, substantial evidence supports that ALJ's finding that Plaintiff's impairments did not prevent her from performing light work with additional limitations. *See* Tr. at 22.  In March 2012, June 2013, and June 2014, Plaintiff stated that her health did not limit her ability to perform moderate activities, such as moving a table, pushing a vacuum cleaner, bowling, or playing golf.  *See id.* at 320, 331, 341.  In June 2015, approximately three months before her insured status would expire, Plaintiff stated that her health limited her only "a little" in moderate activities.  *See id.* at 309.  Similarly, treatment notes from the relevant period demonstrate only "moderate restriction," moderate obstructive lung disease," or a "possible mild restrictive ventilator defect."  *Id.* at 241, 440, 495.

As the Commissioner correctly notes, Plaintiff does not directly address this evidence, and instead tries to shift the burden of showing her limitations to the ALJ.  Plaintiff argues that the ALJ could not make sense of this evidence, much less find that Plaintiff had not met her burden of showing that her impairments prevented her from performing the work described in the RFC finding without an opinion from a medical source.  *See* Dkt. No. 8 at 16-18.  Plaintiff's argument has two problems.

First, Plaintiff bears the burden of proving her limitations.  *See Debra M. v. Berryhill*, No. 5:17-cv-1359, 2019 WL 2420327, *9 (N.D.N.Y. Feb. 4, 2019) ("Clearly Plaintiff bears the burden of proving disability") (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so").  Further, the lack of a medical opinion weighs against a plaintiff's claims, not the ALJ's decision.  *See Barry v. Colvin*, 606 Fed. Appx. 621, 622 (2d Cir. 2015) ("A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent

record evidence, can constitute substantial evidence supporting a denial of benefits").  Here,

Plaintiff's argument is nothing other than "improper-burden shifting" because she "[wa]s unable to

point to evidence that supports a finding that she has greater limitations than the ones found by the

ALJ." *Jones v. Colvin*, No. 6:16-cv-44, 2017 WL 3016839, *4 (N.D.N.Y. July 14, 2017); *see also*

*Smith v. Berryhill*, 740 Fed. Appx. 721, 726 (2d Cir. 2018) (holding that the plaintiff "had a duty

to prove a more restrictive RFC, and failed to do so") (citations omitted).

The cases cited by Plaintiff, which have reached a different result, are unpersuasive.  For

example, Plaintiff relies on *Smith v. Astrue*, 896 F. Supp. 2d 163 (N.D.N.Y. 2012), which held

that an ALJ has an "independent duty to make reasonable efforts to obtain a report prepared by a

claimant's treating physician."  *Smith*, 896 F. Supp. 2d at 176 (quoting *Devora v. Barnhart*, 205 F.

Supp. 2d 164, 174 (S.D.N.Y. 2002)).  *Devora*, however, involved a *pro se* claimant, which is a

material distinction because the court there found that the ALJ was subject to a "heightened duty

to develop the administrative record."  *Devora*, 205 F. Supp. 2d at 172 (citation omitted).

Additionally, the court in *Smith* relied on an outdated regulation.  *See Smith*, 896 F. Supp. 2d at

176 (stating that the Commissioner's responsibility included making "every reasonable effort" to

help the claimant get "medical reports" from his or her medical sources) (citing 20 C.F.R. §

416.912(d) (2012)).  Current regulations clarify that the Commissioner will make every

reasonable effort to help a claimant get "medical evidence" from his or her medical sources, *see*

20 C.F.R. § 404.1512(b)(1), and request the source's "records ... covering at least the 12 months

preceding the month in which [the claimant] files [his or her] application," 20 C.F.R. §

404.1512(b)(1)(ii).  The current regulations do not require the Commissioner to seek and obtain a

new assessment of a claimant's limitations from his or her medical sources.  And, in any event, the

cases cited by Plaintiff either predate or do not discuss the Second Circuit's statements in *Barry*,

606 Fed. Appx. at 622, and *Smith*, 740 Fed. Appx. at 726, about the claimant's burden to show a more restrictive RFC.

As to Plaintiff's argument that courts have characterized an RFC as being a "medical determination," Dkt. No. 8 at 17, that characterization is inaccurate.  SSA rulings and subregulatory policy are clear that the RFC is an "administrative assessment."  SSR 96-8p, 1996 WL 374184, at *2; *see also* 20 C.F.R. § 404.1546(c) (placing responsibility for assessing the RFC, when a claim is at the ALJ level of administrative review, with the ALJ).

Second, contrary to Plaintiff's contention, the ALJ was capable of making sense of the evidence without a physician's opinion.  To be sure, courts have held that an ALJ should not "interpret[] raw medical data" that requires medical expertise.  *See Sonjah H. v. Berryhill*, No. 3:17-cv-1324, 2019 WL 936630, *10 (N.D.N.Y. Feb. 25, 2019).  Here, however, the evidence required no such expertise.  *See Hanson v. Comm'r of Soc. Sec.*, No. 15-cv-150, 2016 WL 3960486, *9 (N.D.N.Y. June 29, 2016) (rejecting the plaintiff's argument that the ALJ interpreted raw medical data and substituted his own lay opinion for that of a medical source).  Rather, the evidence required no such interpretation: although testing showed pulmonary obstruction or restriction, *see* Tr. at 468, 495, Plaintiff repeatedly stated that her health caused no or "little" limitations in moderate activities, *see id.* at 309, 320, 331, 341; healthcare providers described the restriction or obstruction as only "mild" or "moderate," *id.* at 241, 440, 495; and they repeatedly observed that Plaintiff had normal respiratory rhythm and effort, *see* 231, 237, 240, 626 — contradicting her subsequent testimony about "[d]ifficulty breathing" and "gasping for air."  *Id.* at 41.  Taken together, this constitutes substantial evidence for the ALJ's finding that Plaintiff had not met her burden of showing limitations beyond those in the RFC finding.

### b. Discussion of the Evidence

Plaintiff also argues that the ALJ "fail[ed] to cite any evidence supporting the RFC she found. As a result the Court cannot review the determination and it must therefore be remanded." Dkt. No. 8 at 18.

Contrary to Plaintiff's assertions, the ALJ's decision cited to relevant medical evidence, as well as Plaintiff's own testimony, in support of her decision. For example, the ALJ cited to the following in her decision: (1) Plaintiff's pulmonary function test in July 2014, which showed only "moderate" obstructive lung disease, normal lung volume, and normal diffusion capacity, *see* Tr. at 241; (2) treatment notes from late 2014, which showed improvement after an infection, *see id.* at 233; (3) treatment notes from early 2015, which showed that Plaintiff had nasal congestion, was not seeing an ear, nose, and throat physician, and had a sufficient gait for exercise testing, *see id.* at 230-31; (4) pulmonary function testing in June 2015, which showed that a measurement of how much air Plaintiff could force from her lungs in one second ($FEV_1$) was 66% of the predicted value, signifying moderate COPD, *see id.* at 468; (5) treatment notes from June 2015, which showed no abnormalities aside from mild wheezing and that Plaintiff's COPD and asthma were stable, *see id.* at 459; and (6) treatment notes from July 2015, which showed some sinus congestion but no chest pain, palpitations, or swelling (edema), *see id.* at 438.

Additionally, the ALJ pointed out that Plaintiff's treatment was essentially routine and conservative, and that no physicians had opined that Plaintiff had any limitations. *See* Tr. at 24. Far from failing to build an "'accurate and logical bridge,'" as Plaintiff claims, the ALJ discussed the evidence showing that Plaintiff's impairments did not cause any limitations beyond those in the RFC finding.

### c. Plaintiff's Sleep Apnea

Next, Plaintiff argues that the ALJ committed error in both failing to include her sleep apnea when determining her RFC, and in finding that her sleep apnea was non-severe. *See* Dkt. No. 8 at 19-20.  Plaintiff claims that, in the surveys she filled out, it was noted that she suffers from fatigue and falls asleep during the day, but that the ALJ makes no mention of these allegations or how it impacts her RFC. *See id.* at 19.

An impairment is severe only if it "significantly limit[s]" a claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a).  Though minimal, the burden of showing a severe impairment rests with the plaintiff. *See Bergeron v. Astrue*, No. 09-cv-1219, 2011 WL 6255372, *3 (N.D.N.Y. Dec. 14, 2011) (citations omitted).  "The mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment is not, itself, sufficient to deem a condition severe." *Karen R. v. Berryhill*, No. 1:17-cv-1232, 2019 WL 1284250, *4 (N.D.N.Y. Mar. 20, 2019) (quotation omitted).

As the Commissioner correctly argues, substantial evidence supports the ALJ's finding that Plaintiff's sleep apnea was not severe and did not cause any limitations beyond those in the RFC finding.  First, there are Plaintiff's own statements.  Several times during the relevant period, Plaintiff either denied feeling tired or having little energy, or she denied any resulting difficulties in doing work, taking care of things at home, or getting along with others. *See* Tr. at 316, 327, 337, 348.  In February 2015, Plaintiff reported dozing off during inactivity, but not while active. *See id.* at 230.  Even when Plaintiff reported sleep apnea in June 2015, she described it as "mild." *Id.* at 456.  Then, after the relevant period, Plaintiff stated that she was not interested in using a CPAP machine. *See id.* at 530.  Another court in this district has agreed that sleep apnea was not severe, based in part, on the claimant not seeking recommended treatment for that condition. *See*

*Flowers v. Comm'r of Soc. Sec.*, No. 6:16-cv-1084, 2018 WL 895579, *2 & 6 (N.D.N.Y. Feb. 13, 2018).

Additionally supporting that ALJ's decision are Plaintiff's own treatment notes. Rather than showing any fatigue or lack of energy during the relevant period, the notes routinely show that Plaintiff was oriented and alert, *see* Tr. at 232, 234, 237, 241, 440, 625, 628, with unimpaired memory, *see id.* at 628, normal attention span, and normal concentration, *see id.* at 440. These notes, combined with Plaintiff's contemporaneous denials of any difficulties with fatigue or tiredness, *see id.* at 316, 327, 337, 348, refute her current argument that she "suffers from fatigue and falls asleep during the day," Dkt. No. 8 at 19. They further support the ALJ's finding that her sleep apnea was not severe and did not cause any limitations beyond those in the RFC. *See Eric B.J. v. Comm'r of Soc. Sec.*, No. 6:17-cv-511, 2018 WL 9815996, *10 (N.D.N.Y. Nov. 7, 2018).

### d. Evaluation of Plaintiff's Alleged Symptoms

Plaintiff contends that "[t]he explanation underlying the RFC contains the typical language that though [Plaintiff's] medical determinable impairments (MDI) could reasonably be expected to cause the alleged symptoms, her statements 'concerning the intensity, persistence and limiting effects of these symptoms is not entirely consistent with the medical evidence and other evidence in the record for the reasons explained it the decision.'" Dkt. No. 8 at 20 (quoting Tr. at 23). Plaintiff contends that while the ALJ references "a resolved respiratory infection, chronic nasal congestion and a normal chest x-ray," "such incidental findings are irrelevant in the face of the fact that [Plaintiff's] PFT findings, while variable, are consistently significantly below normal, as noted in the survey." *Id.* at 20-21. In response, the Commissioner contends that Plaintiff misstates the standard for evaluating allegations of disabling symptoms. *See* Dkt. No. 9 at 21.

"In evaluating a claimant's credibility, the ALJ must follow a two-step process." *Wetzel v. Berryhill*, 783 Fed. Appx. 44, 47 (2d Cir. 2019) (citing *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). "First, 'the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.'" *Id.* (quotation omitted). "Second, 'the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" *Id.* (quotation omitted); *see also* 20 C.F.R. § 404.1529(c).

In the present matter, the ALJ determined that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms. *See* Tr. at 23. The ALJ considered Plaintiff's alleged symptoms, such as her alleged inability to walk, run, or exercise from January 2012 to September 2015. *See id.* at 23, 43. The ALJ then found that Plaintiff's allegations were not entirely consistent with the other evidence in the record. *See id.* at 23. Substantial evidence supports the ALJ's finding. *See Wetzel*, 783 Fed. Appx. at 47 (affirming the ALJ's decision not to accept allegations of symptoms).

As the ALJ noted, Plaintiff had received conservative treatment and that medications had been "relatively effective" in controlling her symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(iv)-(v) (allowing the ALJ to consider alleged symptoms in light of the claimant's medication and treatment for the symptoms). The ALJ discussed the fact that Plaintiff felt better after taking medication for a respiratory infection and that her COPD and asthma were stable with medications. *See* Tr. at 23, 233, 459. The ALJ also pointed out that Plaintiff did not seek treatment with an ear, nose, and throat specialist. *See id.* at 23, 230.

Plaintiff argues that her COPD "will worsen regardless of treatment" and that her treatment "is not an effective measure of the severity of the condition." Dkt. No. 8 at 22. This

26

argument, however, ignores agency regulations, which specifically permit an ALJ to evaluate a claimant's alleged symptoms in light of his or her treatment. *See* 20 C.F.R. § 404.1529(c)(3)(v). As the Commissioner correctly notes, other courts in the Second Circuit have recognized that an ALJ can consider a claimant's conservative treatment for COPD. *See Roll v. Colvin*, No. 13-cv-7, 2014 WL 1660627, *6 (W.D.N.Y. Apr. 25, 2014); *Gittens v. Astrue*, No. 12-cv-3224, 2013 WL 4535213, *9 (S.D.N.Y. Aug. 26, 2013).

Further, the ALJ appropriately pointed out that no physicians had opined that Plaintiff had any limitations beyond those in the RFC finding. *See* Tr. at 24. Although the Commissioner asked Drs. Lisker and Baldwin to "express [an] opinion about [Plaintiff's] ability to do work-related physical or mental activities," Tr. at 244, 469, neither provided such an opinion. Again, Plaintiff bears the burden of proving her limitations, which she failed to do. *See Smith*, 740 Fed. Appx. at 726 ( holding that the plaintiff "had a duty to prove a more restrictive RFC, and failed to do so") (citations omitted).

Additionally, the Court notes that the ALJ appropriately pointed out that Plaintiff's daily activities could not be verified and that other evidence in the record contradicted her allegations of limited daily activities. *See* Tr. at 24, 40-41, 43. For example, Plaintiff testified during the hearing that climbing stairs "was an issue" between January 2012 and September 2015. *See* Tr. at 40-41. However, during that period, Plaintiff stated multiple times that, in climbing several flights of stairs, her health either caused no limitations or limited her only "a little." *Id.* at 309, 320, 331, 341. Further, Plaintiff testified that she could not walk or run, *see id.* at 41, but in July 2014, she reported recently starting cardiovascular exercise, which was "significant exertion" and caused labored breath. *See id.* at 239. Additionally, Plaintiff's healthcare providers regularly observed that she had normal gait. *See id.* at 231, 234, 237, 241. Finally, Plaintiff testified that

her husband had started helping with chores between January 2012 and September 2015 because they were "becoming very difficult." *Id.* at 43.  During that same period, however, Plaintiff stated that her physical health did not limit her work or daily activities, or that her health limited her "a little" in moderate activities.  *See id.* at 309, 320, 331, 341.  These inconsistencies, which undermine Plaintiff's description of her activities, support the ALJ's observation that nothing objectively verified Plaintiff's activities or showed that any limitations in the activities arose from her impairments.  *See id.* at 24; *see also* SSR 16-3p, 2017 WL 5180304, *6 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence").

Finally, the Court notes that, without citation to any evidence that directly contradicts the ALJ's RFC finding, Plaintiff argues that the ALJ "engaged in the improper picking and choosing of evidence." Dkt. No. 8 at 21.  However, the law is clear that "there is no requirement that the ALJ mention every piece of evidence in the record." *Binder v. Comm'r of Soc. Sec.*, No. 5:15-cv-738, 2016 WL 4079533, *6 (N.D.N.Y. July 29, 2016); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("Where ... the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability").  Here, Plaintiff's conservative treatment, the lack of any opinions from a treating or examining source, and Plaintiff's repeated statements during the relevant period showing relatively few limitations from her impairments, support the ALJ's evaluation of her allegations.

### e. Reliance on the Vocational Expert's Testimony

"At Step Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v)).  "An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *Id.*  "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion,' ... and accurately reflect the limitations and capabilities of the claimant involved." *Id.* (citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)) (internal quotation omitted).

Here, Plaintiff first argues that the ALJ should have included additional limitations in the RFC and corresponding hypothetical question to the vocational expert.  *See* Dkt. No. 8 at 23-24. As set forth above, however, the ALJ correctly found that Plaintiff had not met her burden of showing that her impairments caused any limitations beyond those in the RFC finding.  As such, the Court finds that this argument is without merit.

Second, Plaintiff argues that the vocational expert "conceded that the jobs required activity of which the claimant is incapable." *Id.* at 24.  However, the vocational expert testified that working as a bailiff, merchant patroller, or security guard had no requirements beyond the limitations identified in the RFC finding.  *See* Tr. at 53.  The vocational expert testified, and the *Dictionary of Occupational Titles ("DOT")* confirms, that these occupations qualify as light work. *See id.*; *see also DOT* §§ 377.667-010, 1991 WL 673189 (bailiff), 372.667-038, 1991 WL 673101 (merchant patroller), 372.667-034, 1991 WL 673100 (security guard).  When Plaintiff's attorney asked the vocational expert whether a merchant patroller or security guard "may have to perform say running or increased exertional activity" to "keep eyes on [a] perpetrator," the vocational

29

expert explained that "the potential to have to chase somebody ... may be there" but that the jobs did not require it. *See* Tr. at 56. The vocational expert further explained that a security guard is taught "not to engage" with unruly individuals and to call police officers instead. *See id.* at 55.

Accordingly, the Court finds that the ALJ's hypothetical questions to the vocational expert accurately reflected Plaintiff's limitations and capabilities and the positions identified that Plaintiff could perform was based on substantial evidence. As such, the Court denies Plaintiff's motion seeking remand to the Commissioner and grants the Commissioner's motion seeking dismissal of this action.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Commissioner's decision denying benefits is **AFFIRMED**; and the Court further

**ORDERS** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 8) is **DENIED**; and the Court further

**ORDERS** that the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 9) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED**; and the Court further

**ORDERS** that the Clerk of Court shall enter judgment in the Commissioner's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: May 13, 2020
      Albany, New York

Mae A. D'Agostino
U.S. District Judge